# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

### No. ACM S32701

_____

### UNITED STATES
*Appellee*

**v.**

### Jeremy T. TODD
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 28 November 2022

_____

*Military Judge:* Mark W. Milam.

*Sentence:* Sentence adjudged 1 March 2021 by SpCM convened at Shaw Air Force Base, South Carolina. Sentence entered by military judge on 2 April 2021: Bad-conduct discharge and confinement for 6 months.

*For Appellant:* Major Alexandra K. Fleszar, USAF.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major Morgan R. Christie, USAF; Major John P. Patera, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before KEY, RAMÍREZ, and GRUEN, *Appellate Military Judges*.

Judge RAMÍREZ delivered the opinion of the court, in which Senior Judge KEY and Judge GRUEN joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

RAMÍREZ, Judge:

A military judge found Appellant guilty, in accordance with his pleas, of one charge and 15 specifications of making a false official statement, in violation of Article 107, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 907.[1]

Appellant was originally charged with 30 specifications of making a false official statement. However, as part of a plea agreement, the case was referred to a special court-martial instead of a general court-martial. Additionally, the convening authority agreed to withdraw and dismiss the 15 specifications to which Appellant pleaded not guilty.[2] The plea agreement provided that the military judge would not impose forfeiture of pay, and the convening authority agreed to waive any automatic forfeitures of pay for six months depending on the sentence imposed by the military judge. The plea agreement also provided that any reduction in grade would be no lower than E-4, and that any confinement would total between 180 days and 270 days. There were no other limitations on the sentence. The military judge sentenced Appellant to a bad-conduct discharge, six months of confinement, and a reprimand. The convening authority took no action on the findings, disapproved the reprimand, waived the automatic forfeitures for six months to benefit Appellant's spouse, and approved the remainder of the sentence.

Appellant personally raises three issues on appeal which we have reworded as follows: (1) whether trial defense counsel was ineffective for purposes of sentencing; (2) whether the sentence is inappropriately severe; and (3) whether the trial counsel's sentencing argument was improper.[3] Additionally, Appellant, in a footnote, raises the following issue: (4) whether the cumulative effect

---

[1] Some offenses were committed before 1 January 2019, and others were committed after that date. We considered the applicable edition of the *Manual for Courts-Martial* in our review of the punitive articles of the UCMJ. Unless otherwise noted, all other references to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*).

[2] On 12 August 2022, we issued a show cause order to address the dismissed 15 specifications because the entry of judgment (EoJ) does not indicate that the specifications were dismissed with or without prejudice; nor does it reflect any entered pleas or findings for the Charge. On 26 August 2022, the Government responded to the show cause order agreeing that the EoJ should be modified to reflect that the dismissal of the specifications will be with prejudice upon completion of appellate review. As to the EoJ not reflecting the pleas and findings for the Charge, we note that Appellant did not raise this issue and we find no prejudice. However, pursuant to our authority under Rule for Courts-Martial 1111(c)(2), the court modifies the EoJ in its decretal paragraph to reflect the plea and finding of guilty to the Charge.

[3] All three issues were raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

of the assigned errors warrants sentence relief. We find no material prejudice to a substantial right of Appellant and affirm the findings and sentence.

## I. BACKGROUND

During the charged timeframe, Appellant was serving as a recruiter in the 337th Recruiting Squadron (337 RS), Shaw Air Force Base (AFB), South Carolina. Specifically, Appellant was assigned as the recruiter for the Spartanburg, South Carolina, area and was responsible for preparing enlistment documents for those seeking to enlist in the United States Air Force. Part of this preparation included reporting whether recruits had Junior Reserve Officers' Training Corps (JROTC) experience or earned any awards while participating in JROTC. The 337 RS had a quota system whereby Appellant was expected to recruit three to five recruits per month. However, according to Appellant, he was falsifying records "so [he] could meet [his] quota and reduce [his] workload."

Appellant explained during his guilty plea inquiry that the majority of potential military candidates in his area of responsibility scored very low on the Armed Services Vocational Aptitude Battery (ASVAB) test which meant that those recruits were eligible for very few jobs or Air Force Specialty Codes. However, Appellant explained that by falsifying records, he was able to enlist individuals into the United States Air Force more quickly. Specifically, Appellant's scheme involved creating documents which falsely stated that recruits had JROTC experience when they did not; then he used the names of actual military officers, purporting to recommend his recruits for the Congressman Herbert Advanced Placement Award (CHAPA)—an award which required JROTC experience. Using a recruiting database, Appellant would scan, upload, and send the falsified documents to the Military Entrance Processing Station (MEPS) and to the recruiting squadron. Appellant further explained to the military judge that the CHAPA recommendation "letter was intended to give [recruits] the job choice, or job preference of their choice, which in turn helps [Appellant] meet [his] quota based on the job that [the recruits] want." He added, "[W]ith that letter it guarantees [a low-qualified individual] a job, versus waiting a year and possibly never even getting the job." He concluded by telling the military judge, "Obviously my hope was that [the recruits] would then talk to their friends about how I was a good recruiter, and then [their friends] would start coming into the recruiting office."

Appellant also told some of his recruits to lie about their medical history while at MEPS. Between February 2017 and July 2019, Appellant recruited 64 individuals. Of those 64 individuals, at least 13 enlistment packages contained

fabricated JROTC records which allowed those individuals to receive preferential job selection and advanced rank upon training completion. Additionally, 14 of the 64 records contained other "discrepancies."

The Air Force eventually found out about Appellant's activities when he inadvertently sent a text message to his flight chief instructing one of his recruits to be untruthful about their JROTC experience. The text message ended with "remember that extra money." The Air Force then began an investigation which led to Appellant's prosecution.

## II. DISCUSSION

### A. Ineffective Assistance of Counsel

Appellant claims that his trial defense counsel was ineffective in two ways. First, Appellant alleges that trial defense counsel's sentencing preparation, presentation, and evidence were insufficient. Second, he alleges trial defense counsel did not advise him about which matters could be addressed in his unsworn statement. To support his claim, Appellant moved to attach a declaration written by himself, a declaration written by his mother, his medical records, and news articles. We granted the motion. In response to an order from this court, the Government moved to attach a responsive declaration from Appellant's trial defense counsel. We find it appropriate to consider the submitted declarations and the attachments to the declarations to resolve the ineffective assistance of counsel claims.[4] As discussed below, we do not find that Appellant has met his burden.

#### 1. Additional Background

##### a. Appellant's Declaration

In his declaration, Appellant alleges error by trial defense counsel for failing to present evidence of a physical injury that he had at the time of trial and evidence regarding the poor culture in the recruiting career field. Specifically, Appellant states he had a back injury that required injections and pain medication—information not introduced during sentencing. Appellant asserts he would have included this information in his sentencing package or unsworn statement if he had been advised by his trial defense counsel that he could have done so. As to the poor culture, Appellant states that email evidence existed on his seized work computer which demonstrated his crimes were "more widespread than people realized" in his career field and that it was "the nature

---

[4] *See United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020) (noting Courts of Criminal Appeals may consider declarations "when necessary for resolving claims of ineffective assistance of trial defense counsel").

of the recruiting field." Appellant is unaware as to whether trial defense counsel had access to those emails, but purports that the topic was never mentioned during sentencing. His declaration continues that the recruiting career field was a bad place to work and placed too many demands on recruiters. Appellant next claims that when he showed his trial defense counsel a newspaper article supporting these sentiments, trial defense counsel responded to the effect of, "[W]orry about [your]self and what [you] did, and not [about] other people."

Appellant's declaration further asserts that trial defense counsel failed to interview potential defense witnesses and misled him as to the likelihood of the military judge sentencing him to a bad-conduct discharge. As to potential witnesses, Appellant states he provided the names and contact information for his mother; Dr. AS, one of Appellant's friends who was a former military recruiter; and others. According to Appellant, he was told that he needed to go out and get character statements from those individuals but alleges his trial defense counsel never "interviewed [them] for sentencing."

While Appellant admits in his declaration that trial defense counsel informed him that a bad-conduct discharge "was a possibility," he claims trial defense counsel told him that he would not receive a bad-conduct discharge for his offenses, and trial defense counsel "only ever had one [bad-conduct discharge] in his entire career," which was for an Airman who "had used heroin multiple times." Appellant further asserts his trial defense counsel said that "he knew the [military] [j]udge very well," he and the judge "were on good terms," the military judge "was a defense friendly judge," and that Appellant "just needed to trust him." According to Appellant, he was also worried because trial defense counsel told Appellant that he was leaving Shaw AFB and that this was "one of his last cases, and that he wanted a plea deal very much."

Notwithstanding all these issues, Appellant makes clear that "[n]o one forced [him] to take the plea, and [he] took it knowing all the possibilities," then "pleaded guilty understanding that the [bad-conduct discharge] was a possibility, but believing it was an unlikely possibility." However, Appellant acknowledges that he and his trial defense counsel did discuss that the "[G]overnment would not move forward with a plea agreement without the possibility of a punitive discharge on the table."

Appellant asserts that he was prejudiced because the bad-conduct discharge has limited his ability to work for the federal government, become a police officer, or have a military funeral.

### b. Trial Defense Counsel's Declaration

Trial defense counsel submitted a declaration responsive to Appellant's claims of ineffective assistance of counsel. In it, trial defense counsel explains that the case was initially referred to trial as a general court-martial with 30

specifications, but was later referred to a special court-martial with only 15 specifications because of trial defense counsel's plea-agreement negotiations.

As to allegations that he was ineffective for failing to sufficiently investigate, present, and argue mitigating and extenuating evidence, trial defense counsel explains in his declaration that he acknowledged what Appellant was telling him concerning other recruiters engaging in similar behavior. However, he also makes clear that he told Appellant that it was not a defense to the misconduct, especially if not done at the direction of someone in his chain of command or under duress. Trial defense counsel explains that Appellant acknowledged that his actions were not at the direction of someone else or done under duress. According to trial defense counsel, he and Appellant

> agreed that the "it's the culture of recruiters" approach as mitigation/extenuation risked being interpreted as a failure to take responsibility or an attempt to deflect responsibility, which was risky given the fact that there were 26 recruits identified to testify against [Appellant] and given that [Appellant] not only survived by this practice, but thrived in it.

According to trial defense counsel, Appellant regularly received awards and recognition for his high performance which would have provided the Government a "prime opportunity" for rebuttal in sentencing. Trial defense counsel continues, that he "informed [Appellant] that [he] did not believe that was the best course of action and [Appellant] acknowledged that he understood and agreed."

As to the issue of potential defense sentencing witnesses, trial defense counsel states that his defense paralegal informed Appellant that if Appellant provided them with a list of individuals, then the defense team would make initial contact with those people, request character letters on Appellant's behalf, and ask each of them if they would be willing to testify at the court-martial. According to trial defense counsel, Appellant wanted to take a different approach. Trial defense counsel explains that Appellant, "citing concerns that he did not want a ton of people to know about his case," asked for a character statement template and stated that he would send it to potential witnesses himself and have them return the letters to the defense team. Trial defense counsel complied with Appellant's request but had concerns about one of Appellant's character witnesses, Dr. AS, as Dr. AS was a former Air Force recruiter who had been court-martialed for misconduct relating to his status as a recruiter by the same legal office that filed charges against Appellant. Nonetheless, trial defense counsel allowed Appellant to make the decision as to whether Dr. AS would be a positive character witness for his defense. As to witness testimony, trial defense counsel states that the Government would not pay for the travel of defense witnesses due to a term of the plea agreement,

6

which he told Appellant. However, trial defense counsel provides that he explained to Appellant that defense witnesses could still appear in person if they chose to pay for their own travel, or they could testify by phone or video teleconference. Ultimately,

> no one that [Appellant] or [the Area Defense Counsel's] office reached out to in the course of pretrial preparation were [sic] willing to testify for [Appellant] during sentencing proceedings, to include his wife and mother. Despite these setbacks, [trial defense counsel] was still able to put together a sentencing package in mitigation and extenuation totaling 37 exhibits.

As to the allegation that trial defense counsel did not advise Appellant about information that could be included in his unsworn statement, trial defense counsel states that the defense paralegal emailed Appellant about preparing an unsworn statement. The email detailed how an unsworn statement is used during a court-martial, provided an informational handout for Appellant's review, and included an example of an unsworn statement to use as a guide. Additionally, Appellant was given a deadline (approximately two weeks before his court-martial) to return a draft unsworn statement to the defense team so that they could work with Appellant "to polish it." However, trial defense counsel explains that two days before his deadline, Appellant "responded with less than half a page of content for his verbal unsworn [statement] and no material for a written one." Trial defense counsel states he nonetheless continued to work with Appellant to produce what was eventually a five-page written unsworn statement and explains that he "discussed at length with [Appellant] all of the things [Appellant] could include in his unsworn" statement. According to trial defense counsel, the specific matters Appellant now claims he would have included in his unsworn statement are issues that Appellant "barely discussed," or is information Appellant did not provide in his original draft or during any of the follow-up efforts to bolster Appellant's unsworn statement.

Finally, as to the issue of Appellant's expectations for a bad-conduct discharge and related conversations, trial defense counsel explains that he told Appellant "multiple times over months of court preparations" that a bad-conduct discharge "was a very real possibility." Trial defense counsel further states that he advised Appellant that he was facing 150 years of confinement and a dishonorable discharge prior to negotiating the plea agreement. While trial defense counsel attempted to negotiate a plea agreement that did not include the possibility of a bad-conduct discharge, his declaration provides that the Government would not agree to that term.

Trial defense counsel also contradicts the allegation that he wanted Appellant to plead guilty because he was leaving Shaw AFB. He explains that Appellant's court-martial was in March 2021; that he was not relocating until July 2021; that he had several other courts-martial scheduled after Appellant's trial date; and that he returned to Shaw AFB to attend to approximately ten more cases after Appellant's case. Trial defense counsel concludes his declaration with: "the notion that I wanted [Appellant's guilty] plea in a self-serving way is entirely false."

Together with his declaration, trial defense counsel provides seven attachments supporting the factual assertions.

**2. Law**

We review claims of ineffective assistance of counsel de novo. *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (citation omitted). Appellate courts give great deference to trial defense counsel's judgments and presume "counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Morgan*, 37 M.J. 407, 409 (C.M.A. 1993) (citing *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).

Ineffective assistance of counsel claims are analyzed under the test set out by the United States Supreme Court in *Strickland* and we consider "(1) whether counsel's performance fell below an objective standard of reasonableness, and (2) if so, whether, but for the deficiency, the result would have been different." *United States v. Gutierrez*, 66 M.J. 329, 331 (C.A.A.F. 2008) (citations omitted). An appellant has the burden to demonstrate "both deficient performance and prejudice." *Id.* (citation omitted). Additionally, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (alteration and omission in original) (quoting *Strickland*, 466 U.S. at 697).

In conducting an analysis of an ineffective assistance of counsel claim, courts begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). "[T]he burden rests on the accused to demonstrate a constitutional violation." *Id.* An accused overcomes the presumption of competence only when he shows there were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[5] *Strickland*, 466 U.S. at 687.

---

[5] U.S. CONST. amend. VI.

This court does "not measure deficiency based on the success of a trial defense counsel's strategy, but instead examine[s] 'whether counsel made an objectively reasonable choice in strategy' from the available alternatives." *Akbar*, 74 M.J. at 379 (quoting *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001)). For this reason, defense counsel receive wide latitude in making tactical decisions. *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (citing *Strickland*, 466 U.S. at 689). This also applies to trial defense counsel's strategic decisions. *Morgan*, 37 M.J. at 410. "[S]trategic choices made by trial defense counsel are virtually unchallengeable after thorough investigation of the law and the facts relevant to the plausible options." *Akbar*, 74 M.J. at 371 (internal quotation marks and citation omitted.) Moreover, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted).

In making this determination, courts must be "highly deferential" to trial defense counsel and make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. This specifically applies to sentencing. "When there is an allegation that counsel was ineffective in the sentencing phase of the court-martial, we look to see whether there is a reasonable probability that, but for counsel's error, there would have been a different result." *Captain*, 75 M.J. at 103 (internal quotation marks and citation omitted). Additionally, when the allegation concerns not calling specific defense sentencing witnesses, "for a finding of prejudice, the testimony of the prospective witnesses would have had to reduce the sentence awarded by the military judge to something less than" what an appellant received. *Id.*

Finally, in determining whether to grant a post-trial hearing to resolve a factual matter pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967), we are guided by the standard enunciated in *United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997). Courts of Criminal Appeals do not "decide disputed questions of fact pertaining to a post-trial claim, solely or in part on the basis of conflicting affidavits submitted by the parties." *Ginn*, 47 M.J. at 243. Instead, we employ the principles for determining whether a *DuBay* hearing is appropriate. *United States v. Sales*, 56 M.J. 255, 258 (C.A.A.F. 2002) (citing *Ginn*, 47 M.J. at 248). If Appellant's "affidavit is factually adequate on its face but the appellate filings and the record as a whole 'compellingly demonstrate' the improbability of those facts, the [c]ourt may discount those factual assertions and decide the legal issue" without ordering a *DuBay* hearing. *Id.*

**3. Analysis**

We begin by finding that a hearing is unnecessary because, while Appellant's affidavit is factually adequate on its face, as we discuss below, the appellate filings and the record as a whole compellingly demonstrate the improbability of the facts alleged by Appellant. This applies to all of Appellant's claims against trial defense counsel. As such, we discount those factual assertions and decide the legal issues before us. *See Sales*, 56 M.J. at 258.

As to Appellant's first allegation, that trial defense counsel's sentencing investigation, presentation, and sentencing evidence were insufficient, we do not find that Appellant has met his burden. Here, the appellate filings and the record, as a whole, compellingly demonstrate that there was open communication about who could provide character statements, who could testify, in what manner they could testify, who chose not to testify, and that Appellant agreed with trial defense counsel's strategic decisions as to sentencing. Additionally, we see nothing in the record to suggest that, but for the alleged ineffectiveness by trial defense counsel, there is a reasonable probability that there would have been a different result or that the testimony of the prospective witnesses would have reduced the sentence awarded by the military judge.

As to Appellant's second allegation, that trial defense counsel did not advise him about what matters could have gone in his unsworn statement, we again find that Appellant has not met his burden. The appellate filings and the record, as a whole, compellingly demonstrate that Appellant was provided an email outlining what exactly could have gone into the unsworn statement, that he was provided with a written guide, and that he was provided an example of an unsworn statement. Additionally, the filings and the record make clear that trial defense counsel worked with Appellant to bolster his unsworn statement based on the information Appellant provided. Thus, we discount Appellant's claims on this point.

Finally, as to the issue of the surprise of the bad-conduct discharge and Appellant's claim that trial defense counsel led him to believe that he would not be sentenced to a bad-conduct discharge, we find that Appellant's own declaration cuts against his claim. Appellant states in his declaration that trial defense counsel told him "that though it was a possibility based on the plea, [Appellant] would not receive a [bad-conduct discharge] for this offense." However, his position then shifts. Appellant also writes that that "[n]o one forced [him] to take the plea, and [he] took it knowing all the possibilities." Then Appellant continues in his declaration that he "pleaded guilty understanding that the [bad-conduct discharge] was a possibility." Finally, Appellant concludes that he believed that the bad-conduct discharge "was an unlikely possibility." The shifting of Appellant's factual assertions compellingly demonstrates the improbability of Appellant's claimed facts. As such we discount those factual

assertions and conclude Appellant has not demonstrated his counsel was ineffective such that he is entitled to relief.

## B. Sentence Severity

Appellant argues that a sentence to six months of confinement and a bad-conduct discharge is inappropriately severe when considered in light of the nature and seriousness of his offenses, his personal characteristics, and his record of service. He argues that the offense is not serious, that his character traits mitigate the need for both confinement and a punitive discharge, and that his great record of service diminishes the need for a punitive discharge because he already received the minimum confinement contemplated by the plea agreement. As explained below, we see the case differently.

### 1. Law

This court reviews sentence appropriateness de novo. *United States v. Baier*, 60 M.J. 382, 384–85 (C.A.A.F. 2005). "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988). "Sentence appropriateness should generally 'be judged by individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender.'" *United States v. Faughn,* No. ACM S32542, 2019 CCA LEXIS 469 (A.F. Ct. Crim. App. 26 Nov. 2019) (unpub. op.) (quoting *Healy,* 26 M.J. at 395). Although we are accorded great discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

### 2. Analysis

Appellant claims that six months of confinement and the bad-conduct discharge are inappropriately severe. Appellant faced a maximum punishment, based solely on his guilty plea and the forum, of a bad-conduct discharge, confinement for 12 months, reduction to the grade of E-1, forfeiture of two-thirds pay per month for 12 months, and a reprimand. However, with the plea agreement, Appellant's maximum exposure was a bad-conduct discharge, confinement between 180 days (6 months) and 270 days (9 months), reduction to the grade of E-4, and a reprimand.

With regards to the bad-conduct discharge, we have considered that Appellant pleaded guilty, that his crimes were non-violent, and that there was no evidence he directly profited financially. We have also considered that he expressed deep remorse, that recruiting is a demanding and stressful career field, and that Appellant was removed from his assignment from the time he was charged until the time he was sentenced. We have further considered Appellant's prior contributions to the Air Force including overseas deployments, his

lack of a disciplinary record prior to the charges, his achievement and commendation medals, his medical concerns, and his dependents. Additionally, we have considered the facts of the case, which included that Appellant used the identity of real commissioned officers to further his crimes without their knowledge; that he told recruits—future Air Force members—to lie about their qualifications and medical history; and that at least 13 enlistment packages contained fabricated JROTC records which allowed those individuals to receive undeserved preferential job selection and advanced rank upon training completion.

It is not a stretch to conclude that Appellant's conduct imprinted upon the Air Force's newest Airmen the notion that lying is an acceptable method by which to excel in the Air Force. As explained in the stipulation of fact agreed to by Appellant and all counsel:

> The first impression that most prospective Air Force members form of the Air Force is through contact with an Air Force recruiter. This experience is a critical first step in the development of prospective Air Force members because the recruiter establishes expectations about all aspects of life in the Air Force. In addition, the relationship provides the prospective Air Force members the first example of Air Force core values and standards of conduct.

Based on our individualized consideration of Appellant, his character, his service record, and the nature and seriousness of the offenses, we find the approved sentence in this case is not inappropriately severe and Appellant is not entitled to relief.

## C. Trial Counsel's Sentencing Argument

Appellant claims that trial counsel engaged in prejudicial improper sentencing argument and that the military judge should have stopped the argument on his own, even though trial defense counsel did not object. Appellant argues that trial counsel's sentencing argument was improper because she allegedly argued for a "harsher sentence" based on Appellant's duty position as well as the Air Force core value of "integrity first." We disagree.

### 1. Additional Background

Appellant was sentenced by a military judge. During the sentencing argument, trial counsel pointed to the Air Force's core value of "integrity first" as well as Appellant's job as a recruiter. Trial counsel argued that the appropriate sentence in this case was a bad-conduct discharge, nine months of confinement, and reduction to the grade of E-4, which was the maximum sentence contemplated by the plea agreement. Trial counsel's entire argument was based on

Appellant's actions as a military recruiter, his dishonesty, and his lack of integrity, one of the Air Force core values. Trial counsel's entire sentencing argument spans approximately four pages of a 134-page transcript. Trial defense counsel did not object during trial counsel's sentencing argument and the military judge did not stop the argument on his own.

**2. Law**

The issue of "improper argument is a question of law that we review de novo." *United States v. Marsh*, 70 M.J. 101, 106 (C.A.A.F. 2011) (citation omitted). When trial defense counsel does not object to the complained-of comments, we review the issue for plain error. *Id.* (citation omitted). To be entitled to relief, an appellant "must prove the existence of error, that the error was plain or obvious, and that the error resulted in material prejudice to a substantial right." *Id.* Material prejudice in this context occurs when an error creates an unfair prejudicial impact on the sentencing authority's decision. *United States v. Norwood*, 81 M.J. 12, 20 (C.A.A.F. 2021). The requirement anticipates a showing of a "reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id.* (internal quotation marks and citation omitted).

If improper argument occurs during sentencing, we determine whether we can be confident that the appellant was "sentenced on the basis of the evidence alone." *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (internal quotation marks and citation omitted). "When arguing for what is perceived to be an appropriate sentence, the trial counsel is at liberty to strike hard, but not foul, blows." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citations omitted). "It is appropriate for trial counsel—who is charged with being a zealous advocate for the Government—to argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *Id.* (citation omitted).

What is not appropriate is an argument "aimed at inflaming the passions or prejudices" of the sentencing authority. *Id.* Additionally, when a trial counsel has no justifiable basis for his argument that an accused's membership in a certain military unit (as opposed to any other organization) was an aggravating circumstance, but still argues it, we will find trial counsel's comments improper. *United States v. Collins*, 3 M.J. 518, 520–21 (A.F.C.M.R. 1977). Put more succinctly, "absent evidence an accused's crimes in any way affected his duty[,] such argument is impermissible." *United States v. Gruninger*, 30 M.J. 1142, 1143 (A.F.C.M.R. 1990) (emphasis and citations omitted). We have described this as "tantamount to black letter law" and found that doing so "is simply not allowed unless there is some connection between an accused's duty position and the commission of the crime." *United States v. Rhodes*, 64 M.J. 630, 632 (A.F. Ct. Crim. App. 2007), *aff'd*, 65 M.J. 310 (C.A.A.F. 2007).

"[T]he Air Force [c]ore [v]alues are simply inspirational institutional precepts to which all members of the Air Force should aspire." *United States v. Gatewood*, 65 M.J. 724, 725 (A.F. Ct. Crim. App. 2007) (per curiam) (internal quotation marks and citation omitted). "They are of common knowledge to all Air Force members and they do not, by themselves, establish a departmental policy as to what should be done to those individuals who fail to meet them." *Id.* at 725–26. There is "nothing in the Air Force [c]ore [v]alues, relative to punishment, that incorporates a departmental policy mandating a discharge or any other result in the court-martial of an [A]irman who fails to live up to one or more of the [c]ore [v]alues." *Id.* at 726 (internal quotation marks and citation omitted).

### 3. Analysis

Here, we do not find that trial counsel's argument was improper. Appellant's entire criminal scheme was based on his AFSC as a military recruiter. There was a direct connection between Appellant's duty position and the commission of the crime. Thus, Appellant's misconduct was uniquely tied to his recruiting duties, which makes trial counsel's sentencing argument proper. In fact, Appellant's crime could not have occurred without him being a military recruiter. It was the gravamen of the crime itself.

As to the Air Force core value of "integrity first," Appellant claims that, "[a]rguing for a harsher sentence based on a service's [c]ore [v]alues has also been found erroneous in certain circumstances." However, Appellant provides no legal support for his claim, nor does he elaborate as to what these "certain circumstances" are. Trial counsel's argument claiming Appellant's lack of integrity was supported by the facts of the case, by the stipulation of fact, and by the record made during the guilty plea inquiry. Additionally, we do not see trial counsel's argument as one requesting the military judge impose a higher sentence based upon the Air Force's core value of integrity first. We instead accept that trial counsel was simply arguing that Appellant fell short of that specific core value. Therefore, we find that there was nothing legally impermissible by trial counsel's argument.

We find no error in the argument concerning Appellant's duty position or the Air Force core values. Because we find no error, we do not test for prejudice. As Appellant has not met his burden, we grant no relief.

## D. Cumulative error

As noted above, Appellant, in a footnote, asks us to consider whether the cumulative effect of the assigned errors warrant sentence relief. However, there is no briefing on this issue.

"Under the cumulative-error doctrine, a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a

finding." *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011) (internal quotation marks and citation omitted). We will reverse only if we "find[ ] the cumulative errors denied Appellant a fair trial." *Id*.

Here, we found no errors in the raised appellate issues, making the cumulative-error doctrine inapplicable to Appellant's case.

### III. CONCLUSION

The entry of judgment for the dismissed specifications to the Charge is modified (1) by adding "with prejudice attaching upon completion of appellate review upholding Appellant's convictions of the specifications" after "Withdrawn and dismissed," and (2) by including both a plea and a finding of guilty ("G") to the Charge. The findings and sentence as entered in the modified entry of judgment are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court